Glidepath Development, LLC v. Illinois Commerce Commission, NL Good morning, Your Honors. My name is Tom Cushing. I represent the Appellant Glidepath. Good morning, Your Honors. My name is James E. Waking, Special Assistant Attorney General on behalf of the Respondent, Illinois Commerce Commission. Good morning, Your Honor. My name is Matthew Price on behalf of Appellee Commonwealth Edison Company. Okay. Are you guys both going to argue this case? And have you worked out an agreement among yourselves? Yes, we've agreed to split the time in half. Okay. All right. Fair enough. And the Appellant, I mean, Mr. Cushing, you're going to reserve some time for rebuttal? Yes, I'd like to reserve and take three minutes for rebuttal. Okay. All right. Let's proceed. Thank you. Justice O'Neill Burke, Justice Gordon, Justice Reyes, Mr. Foley, Counsel, may it please the Court. What happened below in this instance was wrong. And Commonwealth Edison is asking the appellate court, Commonwealth Edison and the ICC, asking the appellate court to ratify it. And GlidePath is asking you to correct it here by means of this appeal. Mr. Cushing, what's our standard of review here? That's a tangling one, Your Honor, but it is de novo. And to the extent that it's abuse of discretion, we prevail in that instance as well. I'm happy to – I've answered the question. I believe it's de novo. If you'd like an analysis, I'm happy to provide it. Well, I mean, don't we have to give deference to the Commissioner? The appellate court owes deference to the Commission in many instances. In this case, for two reasons, it does not. Number one, it owes deference to the Commission when the Commission is construing its own rules and regulations, and the Commission did not construe its rules and regulations here. There was only one reasoned decision of our five attempts to intervene. There was only one reasoned decision. It was the first one by the ALJ. The ALJ relied upon two circuit court cases that apply the intervention statute, which is inapplicable here as we set out in our briefs and as I'd be happy to discuss, but they expressly never considered or applied their own regulations. So there's no deference there. The second circumstance where deference is granted is to the ICC's findings of fact, because they're the fact finder, right? They hear the evidence. They hear the witnesses. They do this 365 days a year. The appellate court's supposed to defer. In fact, their findings of fact are considered prima facie reasonable in this instance. Mr. Chisholm, would your argument result in if we adopted your reasoning and your argument and ruled in your favor, would that mean the Commission has to allow basically anybody who might have a tangential relationship to litigation from the Commission to intervene? It should be granted very liberally. And so it should be granted very liberally. So basically you're saying don't look at the intervention statute. Just grant the motion to intervene. You don't even have to find standing. First of all, I would agree you don't look at the intervention statute because it is not applicable. Yes. And they set out regulations to govern intervention. And Section 200.200 sets out five different things that have to be included, five different requirements. And there's an ellipsis here. There's something that's unanswered. The regulations don't say it's an abuse of discretion standard. There's a strong legal argument for the notion that that's not the standard, because in 200.200B in the regulations they say when the ALJ is considering whether or not to allow intervention, in its discretion the ALJ may allow that party to be in temporarily, demonstrating that when they wanted to impose a discretionary standard, they knew how to put it in. And they didn't in Section 200.200A and then C and following. So there's a strong argument to be made that an abuse of discretion standard shouldn't be applied. Well, let's accept for a moment. You say, well, you need some standard. So let's accept for a moment that it should be an abuse of discretion standard. Then you look to the regulations 200.25. And it's mandatory. They're standards. And in there their own regulations say that when discretion is being applied, and pardon me, I want to make sure I get the language accurately for the court, but where discretion is being applied, Section 200.25A requires discretion, quote, shall be exercised to accomplish the principal goal of the hearing process, which is to assemble a complete factual record to serve as basis for a correct and legally sustainable decision. So that's, those are the guideposts. That's one of the two guideposts. But wouldn't that open the floodgates to anybody anywhere saying, oh, I want to intervene in this action because it's going to impact me in some tangential way, second time I use that word. Sure. So how. Well, go ahead, please. You go ahead. So how does this position that you're adopting not give everybody the right to intervene? Well, let's take the view that this is government. It's not a lawsuit. This is a regulatory body that's saying, okay, Commonwealth Edison, we've granted them a monopoly. They're going to put a bill, and everybody in this courtroom, they're going to put a bill in your mailbox. And we're going to allow them to make a profit. But the state's going to regulate them. And so when the state regulates them, it should be an open process. If somebody has an interest, they should be allowed to intervene. And you're right, Your Honor, I'm not asking the court, I'm asking the court only to rule on these facts. So I'm not asking the court to say, oh, my gosh, I could imagine a really, the word the court has stumbled over a couple times is tangential, a really tangential circumstance. Well, fortunately, we're not faced with that today. This is not a really tangential circumstance. This is somebody who has an interest that is far superior to everyone else who is allowed to intervene. The second point about being. Were they prejudiced? Yes, Your Honor, I'm sorry. Were they prejudiced by not allowing them to intervene here? They were. They were. How would that be? Well, first of all, I'll answer the court's question. They're prejudiced because they have an interest. Mr. Foley and Glypad, they're in the business of providing. Yeah, but prejudice is not because you have an interest. Prejudice is something more than that. I will answer the court's question. I would say that prejudice is not required to be shown here. Okay. Because that's a notion for the Code of Civil Procedure. Your answer is that they do not have to show prejudice. They do not have to show prejudice. Okay. But the court asked me if they were prejudiced, and I would say they were. Okay. Okay. Okay, but you haven't told me how they're prejudiced. Here we go. We're taking them in order. So, Mr. Foley and Glypad are in the business of, 20 years ago, the legislature said, ComEd's not making the energy anymore. We're going to have private companies make the energy. ComEd just is in charge of the wires. And so, Exelon, the parent company, is allowed to make the energy. And anybody else, any one of us can be in the business. In the room, though, the only one who is in that business is Mr. Foley. So, he makes the energy, and he says, I want to sell it. And if I'm going to sell it to Justice Reyes, I better connect onto the grid, because that's how energy gets to his house. And this General Assembly and the Public Utilities Act, and it's cited liberally in all the briefs, governed how this is supposed to happen. And they said, ComEd, we're letting you guys own the wires. We're going to let you make a profit. But private companies get to provide the energy, and this is how you have to allow them to do it. You've got to let them get in the game. They said, no more producing energy for ComEd. Private companies are doing it. So, now, how is he prejudiced? I am on your question, Your Honor. When Mr. Foley wants to connect an energy project to the grid, there's rules that are set out, Section 466 and 467, in Title 83. Thank God there's rules, right? I shouldn't be allowed to connect to the grid, but there's stringent rules about how you connect, what studies you have to pay for, what engineering hoops you properly have to go through, how to demonstrate it's safe, reliable. It's not going to corrupt what the rest of us get. It's not going to invite terrorists to come in. There's rules, 466 and 467. Mr. Foley is the only party, and Glypath, I should call it Glypath, not Mr. Foley, is the only party who alleged in a petition to intervene that he has done this very thing in Illinois. One of them may have made an allegation they connected. If I'm mistaken on that, I apologize. And he set out, he's the only one who set out that he's aware of all the hurdles, all the hoops, all the costs, all the regulations that go along with that. It's difficult. It should be difficult. One of the things, one of the concerns of Glypath is, gosh, if ComEd kind of gets a blank check, because for this microgrid, they're going to have to let little power companies connect little power sources to run the microgrid. And this is the camel's nose under the tent. ComEd, as we alleged throughout, ComEd wanted to get authority. We just want a little taste. We just want a little taste. We just want to put a little power source in for this microgrid. And all of a sudden, they're in the game. And the question is, and it's still unanswered, are they going to be subject to the, there's some of the specific charges. There's a tariff charge, an H13 tariff charge. Everybody else is subject to it. Are these little projects for ComEd on this microgrid going to be subject to it? We don't know. Same way with a tax gross-up, which is a tax charge that everybody else has to pay. We don't know if ComEd and their vendors are subject to it, Your Honor. All right. So what would be the impact of the project, because it's still continuing on, right, with regards to if we were to reverse the trial court? You know, we have jumped all the way to the end of my argument, and I think that's exactly the question. I don't think there's a dispute over whether my guys were treated unfairly. They were, and I spent probably 30 pages in the brief laying it out. They were treated disparately from everybody else. The notion that somebody else could handle the work is fallacious. My guys tried to come in before the other people came in. Okay, so what can the court do, and should the whole thing get blown up? You're aware there was a little flurry of motion practice in the last two or three weeks about mootness and this and that and the other thing. Well, I finally went to Lawyer 101, and I read the case cited by Commonwealth Edison about mootness, and the name of the case is Tekla, T-E-K-E-L-A. And it says, yes, sometimes things are moot, and it's too late, the ship has sailed, but, and I'm quoting from the Tekla opinion, because ComEd and the ICC made this problem, and now they're coming in and saying, hey, we've already bricked this thing up. This is done. I mean, we already got away with it. But what the case that they cited from the Illinois Supreme Court says is, quote, and this is quoting another case. Let me just stop you for a minute. Isn't the point here that even if you were in there as an intervener, the result would be the same? That is the terrible, hard, cynical truth, because if the ICC was willing to go so far. Yes, but it is the truth of the matter, isn't it? And should we sanction that, Your Honor? First of all, we don't know that. I'm not quite that cynical. Okay? I'm going to take a step back. I'm not quite that cynical. I'm going to imagine that if the most knowledgeable intervener, and on the record, if the most knowledgeable intervener, with his humble attorney, approached the ICC and said, well, wait a minute. You have to consider, are these other parties, which they never did consider in our absence, are these other parties who are going to provide the energy, are they going to be subject to the regs, 466 and 467? Are they going to be subject to the tax grow subs? Are they going to be subject to the H-13 tariff charges? I'm not so cynical as to say, you know, I'm going to rely on those fact finders to do their job and make the decision fairly and honestly. And let the chips fall where they may. I've been a lawyer for 30 years. I know sometimes you lose. I know sometimes you're sure your facts are, you're right on the facts, and sometimes you lose. But we shouldn't be in a position of sanctioning the regulated utility who is allowed to earn a return for its shareholders to put their finger on somebody's head and say, not him. Everybody else is fine. Not him. And it would brazen the ICC's conduct in not even addressing its own regulations here, which require not only that the overriding goal, and the language is in there, the principal goal of exercise of discretion is to gather a complete and accurate record for a legally correct decision. And the other principle for the exercise of discretion is, quote, persons appearing in and affected by the commission proceedings must be treated fairly. Neither of those happen. So the wrong thing happened, and this court is presented with a ticklish issue. I mean, when I discussed it with my law partner, my client, my wife, I said, you know, the tough one here is what's the remedy? So what the Illinois Supreme Court said in the case that was cited in my comment is that a party to a suit is presumed to know all the errors in the record, and such party cannot acquire any rights or interests based on such erroneous decree that will not be abrogated by a subsequent reversal thereof. In other words, hey, if you want to act on the order that was issued, you take your chances, because it might get reversed. And in this instance, that's only just because the error was brought about repeatedly by the respondents in this case. And further on in the technical case, it says the effect of the reversal is to abrogate the decree and leave the cause as it stood prior to the entry of the decree. It goes so far as to say, as would be applicable in this case, if such party, so the party who got the judgment below relied upon it and then took action. If such party has received benefits from the erroneous decree or judgment, he must, after reversal, make restitution. And if he has sold property erroneously adjudged to belong to him, he must account to the true owner for the value. In other words, hey, we're grownups here, and believe me, they know how to play hardball, because we experienced it, and it wasn't right. So the court, as we prayed for in our opening brief, should reverse, should remand with instructions that Glybat be permitted to participate, should order that the order issued by the ICC be vacated, reconduct a hearing with the proper parties in. That's a harsh result, and according to the technical case cited by ComEd, that's warranted. A fallback would be reverse, remand. By the way, the case is still open. The docket is still open, as you're aware. My opponents have filed a supplemental record, because they said, well, we're still doing work down there, and more things have come into the record. I mean, it's still churning away. This case is not over. It's not dead. And ComEd has, or probably the ICC said in their brief, this project is going on for another 10 years. So as a fallback, the court can reverse the exclusion of Glybat, remand, order that Glybat be admitted for the consideration of any other matters still to be considered in the docket. They call them dockets instead of cases, because they're not cases. They're not lawsuits. They're not contests. And to consider the issues that we said we're very knowledgeable about, we felt needed to be addressed in the commission. For instance, are those regulations, 466 and 467, going to be applied to the vendors that ComEd has said, okay, we're going to have these people provide the connections to the grid to supply the energy here. It's only fair that the regulations that apply to everybody should still apply. The purpose of them is for equity and for safety and for security. And will those providers be subject to the costs that every other jamoke who's in the energy business is subject to? I think that should be considered. I do, Your Honor. And I'm glad that the court directed me to the real issue in the case so rapidly. I'll reserve the balance of my time. Thanks to the three of you. Appreciate it. Good morning, Your Honor. Not only did we split the time, I will address the standard of review and denial of intervention cases and aspects supporting the denial of intervention. And Mr. Price will be addressing the mootness issue and the other issues raised in ComEd's brief. The Commission did not abuse its discretion in denying permissive intervention to GlidePath Development, LLC. For over 50 years, the Commission has had a rule in practice requiring in writing a plain and concise statement of the nature of the petitioner's interests. This rule requires disclosure of sufficient legal interest in the proceeding under consideration. It's not satisfied by a mere statement that the petitioner has an interest as claimed by GlidePath. If it were so interpreted, then there's no point for the rule to say the ALG can deny intervention. What about the issue that the Council raises that the Commission didn't follow its own rules and regulations? Therefore, our standard of review is different.  The Council has set pointing to 20.25, which are the goals for exercise of discretion. In fact, the provision he cited directly, too, says it's about the fairness one that's said. It's about how the party's affected by the proceeding, which, of course, is an interest in the case. And we keep coming to this. They can't explain how the granting of these limited issues, after all, we weren't, we were dealing with certain rate-related findings here, and how any of that affects GlidePath's ability to sell these DER products to the third party, the customers, and whatnot. It doesn't affect anything they do. They've argued prejudice. However, they bid to help with the test bed, which was the device which is going to control the grid when it's in isolation. And as far as I know, they had the right to bid on the RFPs to provide the non-storage DER, the energy sources, that are part of this pilot program. Those contracts have been awarded, but they weren't awarded because someone got involved in this case or not. They were just said the bidding things were set out, and people bid, and the lowest bidders presumably won. They haven't been prejudiced in anything they do. Every issue, well, getting to the, I'm getting a little bit off of here, but their issues and their amended petition to intervene, which was the last one they filed, asserted interconnection issues, as they did today, about how you want to know how the third-party distributed energy resources will be handled, and contracted foreign rules and regulations and taxes. Nothing to do with this case. This case wasn't about establishing that kind of thing. So one of their major grounds wasn't a ground that has anything to do with the case and doesn't find a basis for finding anything to do with this. I'll ask you this. The commission allowed ten different organizations to intervene, didn't they? Yes. And this is the only one that they didn't allow? Right. This is the only one. And this is the only one that was a competitor? No. Which one of the other ones was a competitor? The direct energy business, direct energy services, although they listed both, they were combined, they also are a DER provider just like the ALJ in the case. So one other competitor was allowed to intervene? Right. The answer is, of course, that none of these other parties, their petitions to interventions were opposed. They were not contested issues. By comments of opposition to glide path, we made this a contested matter, which the ALJ had a rule on based on their petition, the comment response, and a reply, if there was a reply. And that is the difference between the two. It's a difference. It's one thing to let somebody in who says I have an interest, whatever they say, and no one opposes, and you let in, it's a whole other thing when it says, no, they don't have an interest, and you have to make that judgment ruling. The other issue glide path had in its petition to intervene was ComEd's proposed ownership of the non-storage DER. That's the DER that was going to be provided by other third parties, but ComEd thought if it's more economical, we could own it. And they have withdrawn that issue because it was opposed by a number of the parties, and that's not even an issue in the docket anymore. The glide path has not suffered any prejudice because it didn't participate herein. Well, is there any law that says they have to be prejudiced? Well, they're the ones that pointed to the, well, they have to be adversely affected. That's what the ALJ found, and that's why they cited to the rulings that the ALJ cited on it. They have to have something to lose or gain if the microgrid, this redesign of the distribution grid in Bronzeville is done, and they don't. They can still sell their products to the customers on that grid and whatever else. It just isn't there. Namely, the intervention is either of right or by permission, and of course, that's the Egyptian electric co-op case and the Ramsey emergency services case. Glide path never claimed a statutory right to intervene in this docket. Therefore, its right to intervene is merely permissive. And, you know, again, glide path never showed how the establishment of the microgrid in Bronzeville as a pilot program affected glide path's legal rights adversely. Instead, glide path showed just a general interest in the matter, which were the grounds that were rejected for intervention in Egyptian electric co-op and perhaps even more so in the Ramsey emergency services case. The claim that the denial of intervention is not subject to abuse of discretion is expressly contradicted by the ruling of the Supreme Court in the Egyptian electric co-op and the appellate court's ruling in Ramsey, both of which said we do not find that there was an abuse of discretion when the commission denied the intervention. That's really clear. Counsel has mentioned, and they mentioned in their briefs, that they developed additional findings and whatnot, and the commission on our brief, page 35 of our brief, we relied on United Cities Gas Company, 47, Illinois, second 498 of 501, and the City of Chicago v. Illinois Congress Commission case 281, 3rd, 617, S624. And I'm just going to quote from the last case. The commission is not required to make findings on every evidentiary fact or claim sufficient to have its findings are specific enough for an intelligent review and subcision. The court, we have the ALJ's ruling on the amended petition, and we have the amendment to intervene, which was the last one filed. It's clear as to why the grounds were that they didn't have the sufficient interest in this case. They required to permit them to intervene. Glyde Path in its reply brief at pages 6 and 12 now challenges ComEd's right to own the storage DER, which is necessary to run the microgrid itself when it's isolated from the electric grid. I would point out storage DER is not mentioned specifically in the Glyde Path's amended petition to intervene, nor is the application for re-hearing, because the issue was waived. I would also point out the commission, someone did raise the issue in a case on page 18 of the commission order, which is record volume 4 at C1104. The commission found ComEd must own the storage DER in order to conduct the DOE study and to maintain the necessary reliability and resilience of the microgrid area. The storage DER is something they need to run the storage DER. It is not about supplying electricity, per se, to customers. It's a whole different matter from that. Council has referred to the reports that are filed. Well, it's not uncommon at the commission that after a case is over with, reports are ordered and are filed with the commission, and that's what's happening in this case. The case is not open in the sense that we are going to do anything or there's something pending. ComEd will file this report with us. They'll take a look at it. If something needs to be done, the commission will have to open another proceeding. They probably would open a new proceeding rather than just reopen the old one if there was something it needed to handle. But, of course, this case has to do with whether or not they should go ahead with this and account for it as delivery tariffs and also if there's rate recoverable under the rate case, which the commission has to do. We did not grant them a dollar one yet because they had to wait for the former rate case to ask for the recovery of the money. Do we know what the status of the project is? Well, you know, from the report that we filed in the supplemental record, the RFPs have been awarded. There's parties who are spending money, third parties who are building the non- I think I remember at this point what everything is called, the non-storage DER and includes both solar panels and also these battery systems. This is the first phase of the project and this is partially funded by the Department of Energy and the components are somewhat set by them as to what they want to see. Then there's a second phase that goes on later, which is more massive. In fact, that's the time that when this distribution grid will be separated from the electric grid and stand on its own. Is this project for the public good or for the good of Commonwealth Edison? Well, this is a project that the U.S. Department of Energy wants this to do to see if they can create these distribution grids so they can stand alone if in case the electric grid fails generally that they'll be able to supply electricity for some period on their own completely separated from the rest of the grid. This is the first one ComEd has ever done and it's one of the first in the country. There's a few other projects similar but not identical to ComEd's project. So it's looking to the future, but we don't know how it's all going to work out. So what's the answer to Justice Boyd's question? It serves the public because if they can create these separated distribution grids, then we will have a better, more reliable electric system even if the electric grid goes down or separated from its main sources of energy. Do you want to reserve some time for your colleagues? Yes. Thank you, Your Honor. Good morning, Your Honor. May it please the Court. The appeal should be dismissed for three reasons. The case is moot, there was no error, and there's no prejudice. And I want to start with prejudice, if I may. Justice Gordon, you asked specifically whether there was anything requiring them to show prejudice. The answer to that is yes. If you look at 10-201, subsection E, 4D, where the allegations of the proceedings or manner by which the Commission considered and decided its rule, regulation, order, or decision were in violation of the state, federal, constitution, or laws. So the allegation here is that ComEd violated its rules about intervention in the course of the proceeding. Quote, to the prejudice of the appellant. So that is a necessary element that must be met for this Court to exercise its jurisdiction in reverse of Commission order. Well, isn't there applied prejudice here, given the fact that they weren't allowed to intervene while others did, and then there was really no comment as to why they were not allowed to intervene? Well, there was no prejudice here, and the reason is their main, they had two main issues. The first is that they should be allowed to own non-storage distributed energy resources like solar panels, and at the end of the day, the Commission said, yes, ComEd can't own those things. Third parties are going to own those things. So there's no prejudice there. They got the outcome they wanted. And the second issue was they want to be able to own the storage distributed energy resources, the batteries, and they didn't want ComEd to do that. Well, ComEd put an evidence on that issue. It was uncontested, and the evidence was in order to make this project work, ComEd has to be able to own the batteries because of the operational and engineering constraints of the project. And the issue, who owns the batteries or the storage of the batteries? The question is who owns the batteries. The batteries are called storage DER, so that's the same thing. The question is, should third party, private third parties own them, or should ComEd own them? That's their main issue, and ComEd explained in evidence why, in order to make the thing work, ComEd needed to be able to own the batteries. And they never proffered any evidence whatsoever, even in their offer of proof in their rehearing petition, suggesting that they had anything to offer contrary to that on that issue. And so what's the point of remand for them to put an evidence when they haven't offered to address the issue, the dispositive facts that the Commission used to decide the issue that they care about? So that's why there's no prejudice in this case. Now, in the reply brief, they say, well, we don't need to show prejudice because this is a case about substantial evidence, and they say that this is a case under Section 10-201E4A, that the findings of the Commission need to be supported by substantial evidence. Well, the findings in the ultimate final order are supported by substantial evidence, and they've never contended otherwise. And as for the intervention decision, it's very strange to say that that needs to be supported by evidence. Because there's no factual finding that's involved in it. What the Commission does is receive the petition for intervention, looks at the allegations that are made by the petitioner, evaluates the legal sufficiency of that, just like you would on a motion to dismiss, and makes a legal judgment about whether intervention should be permitted. So to talk about substantial evidence is just, it doesn't fit what the Commission is doing when it's deciding an intervention motion. There's no disputed issue of fact for the Commission to decide in that context. This is a 10-201E4D case, very clearly, as my opponent's argument indicates, and there the statute says you need to show prejudice. Now, on mootness, Justice Reyes, you asked about mootness earlier. I want to just make clear what our position is on mootness. Again, Blypath's complaint was that third parties should be able to own these batteries that would be stored, that would be installed. The batteries have been purchased by ComEd. They've already been installed. And each battery, even if there's a reversal or remand, ComEd is not going to unplug and deinstall the batteries that it already purchased and already expended a lot of money to install. That money is sunk, and the batteries are going to stay there. If there's a reversal or remand, the only question that remains open is whether ComEd should be able to recover the costs of having purchased and installed those batteries. That's an issue that Blypath has no interest in. They're not interested in ComEd's ability to recover the costs. They're interested in being the ones to supply the batteries in the first place. And that ship has sailed. And the reason it's sailed is because Blypath never sought a stay. It never sought to expedite this Court's consideration of this issue. It filed its opening brief ten months after the rehearing order in this case. So it showed no urgency, even though it knew facts were being made on the ground and ComEd was acting in good faith reliance on the Commission's order. And it's basically too late now for Blypath to get any practical relief to the issue that they care about, which is having their batteries be the ones that ComEd is using. Now, turning finally to the issue of the merits, Justice Reyes, you asked about the standard of review. The standard of review is abuse of discretion. The Ramsey case makes that clear. The Egyptian case makes that clear. When there is a decision about intervention, it's committed to the Commission's discretion, particularly when there's no claim of intervention as of this year. And if you look at Rule 200.200, you can see that someone files a statement and the ALJ grants or denies the petition. There's no legal standard for the ALJ to apply. It's a completely discretionary decision. And here there was no abuse of discretion. Now, Justice Burke, you asked questions about the merits. And the main argument of Blypath is this was unfair, they were singled out, and so forth. First, I want to make clear, there were eight other interveners in the case. ComEd didn't object to anybody else, even though many of those other parties were opposed to ComEd. It's not like ComEd is trying to rig the system and clear out everybody who's against it. Many of those interveners were opposed to ComEd. What made Blypath different? Well, two things made Blypath different. The first thing that made Blypath different is that, unlike anybody else in the proceeding, they were the only entity whose primary interest was being a vendor of the batteries that would be used in the project. And when you're talking about a Commission proceeding that is going to result in a competitive procurement, it's understandable why the Commission and ComEd, who's conducting this procurement, wouldn't want parties coming in trying to tweak the terms of the procurement to their commercial advantage. Instead, you would want parties that don't have a business interest in winning the procurement. If ComEd were to go out and buy trucks, you wouldn't want GM and Ford coming in and intervening and trying to jerry-rig the procurement in order to favor their own trucks. And the same thing is true here with batteries. And the Egyptian case is instructive with respect to that. It explains that a general business interest of this kind is not sufficient to warrant intervention. Now, the second reason why Blypath was different is that, unlike anybody else, it wanted to expand the scope of the proceeding to address all sorts of general market policies that this proceeding wasn't about. This was about a particular pilot project in Bronzeville and the costs and how those costs should be recovered. And that's all. It wasn't about general market policies about batteries on the grid. And it was complex enough as it was, and ComEd and the Commission justifiably didn't want to allow a party in that would seek to expand the scope of this proceeding to lots of other issues. And the Ramsey case is instructive there. It talks about how the resolution of the relative merits of competing economic and market theories was not the Commission's task in this case. And that observation is equally true in this case, and that's why the Commission's decision should be affirmed. I have a question. Aside from the issue of the batteries, does ComEd have any other involvement in this project? Well, ComEd is the one who's, I mean, yes, absolutely, in the sense that ComEd is the one who's in charge of making the project operate. It is running the microgrid as the company that runs the distribution wires in Bronzeville. The whole idea of a microgrid is if there's some problem on the larger grid, can we cut the connections between this small area and the larger area so the smaller area can continue to operate and electricity can still flow over the wires? And to do that, you need to have a balance of demand and supply in that smaller area. And that's what a microgrid is designed to accomplish. And ComEd, as the entity that manages and operates the distribution wires, is overseeing and will run the microgrid as a whole. Thank you very much. And the last word before lunch, I'll try to keep it very brief. If I only had 10 seconds, I'd say take a look at that section that Counsel for ComEd just cited and take a look at page 7 of our reply brief. When he says that you have to show prejudice, ComEd points you to a section for review, I think it was subsection capital D, that we are not proceeding under. So weigh all of ComEd's arguments before this court and before the ICC in light of the credibility that they have engendered by pointing to a section that we are not proceeding under. Again, I'll leave it to the, it's laid out in our reply brief at page 7. One point about the standard review, ComEd, Counsel for ComEd makes the point that, you know, there's really, there weren't findings of fact, right? And so, but there was evidence. The evidence were the verified pleadings, the verified petitions to intervene. And so the commission and the ALJ acting for the commission preliminarily has an obligation to, and this court has an obligation to review, to determine whether the rulings were supported by substantial evidence. And in this case, the substantial evidence would be the stipulated facts, what was in the verified pleadings.  So that's one of the reasons why we're not proceeding under the ComEd Act and the section that we come to this court under. Number two, this is, this removes the abuse of discretion standard. As counsel said, I wish I had a transcript, we have the law about how there's, how the decision's supposed to be made and what this court is supposed to use to judge. And then we have facts that are uncontested. It's a question of law. Application of the law, the statute, to the facts, which as they point out, are uncontested. It's just what was in the pleadings. De novo, not abuse of discretion. Abuse of discretion, I'll take it all day. Because there has, there is not, there are not many more clear examples of abuse of discretion. And when counsel says that the question of whether or not ComEd should be allowed to own batteries was uncontested in the case, there is prejudice. And there certainly is prejudice to an independent, third-party market provider of these energy sources. And the regulations define battery as generation, that they generate the energy because they put it out there. It's defined, they don't want to admit that, but it's in there. And we cite it. If somebody's in the business privately in the marketplace of competing and providing these things, we don't sell them to ComEd. We have other people who are buying the energy. We're putting it out. ComEd is just a marketplace. They're just, you know, they're just the Kris Kinnemar. They're just hosting the place where we get together to buy it and sell it. We are not selling it to ComEd. But if, and the precedent that ComEd was able to wrangle out of this thing was that, okay, you guys can own batteries, which according to the regs are generation, and you can lease the source of the energy. You can lease the source of the solar and the wind, which is also unprecedented. Those are big, those are the wins. That's what happened. And Senator Del Valle, who was a commissioner at the time, when he spoke on our behalf, he said, let's be clear. What ComEd is seeking here, they were denied by the General Assembly, so they're coming here for a second fight at the apple. And what they're looking for is a substantial expansion in what they're allowed to do. And every piece of equipment they're allowed to own that gets connected to the grid, not only do they charge the rate payers for that, but every year they say, that was a capital contribution we made in 2018, and they get to apply the multiplier, whatever it is, 1%, 1-10th of a percent, 1-millionth of a percent. They apply a multiplier, and that goes into what they recover from the rate payers every year. So every time a new doohickey gets connected to the grid, if they own it, every rate payer is paying for it. You've been very patient. I could say more, but I think my time is up. Thank you. Thank you for giving us an interesting case, and we'll take it under advisement.